Michael Saphir v. The School Board of Broward County Good morning, folks. And you may proceed, Council, on behalf of the appellants. All right, you take your time. May I please the court? Good morning. In preparing for today, I took note of a subject that was not emphasized in the briefs. It was touched upon, but the significance of it became more apparent the more I read. And I was beginning with the Davis v. DeKalb case of this court on the primary issue which appears in this appeal, which is the deliberate indifference issue. In the Davis case, this court concluded that it went through the various factors that were performed by the school district in terms of immediate corrective action that was taken upon notice of a sexual harassment situation, talked about the investigation that was performed and the effectiveness of it, and took corrective measures even though concluding that there might not have been any inappropriate conduct in the first instance. And the court talked about how decisive that was. In the later case of KB v. Daleville, the court talked about if the school board's response to assault was deficient in any way, a reasonable jury could find that those deficiencies caused the plaintiff's subsequent emotional trauma, which exists in this case. And the court found that it was not clearly unreasonable in that case because the response was, and I quote, swift and effective. By contrast, in this case, the response by the school was neither swift nor effective. Not only did they violate their own policies, but they violated Florida law in not reporting what had been told to them, which was a sexually harassing and potentially sexually assaultive situation. Well, we would all agree that if the information that Michael related two years later to the psychologist had been disgorged on the front end, you might have a different case. But the question is for deliberate indifference, I think, whether based upon what the school knew at the time, that is to say, based upon what Nelson Shapiro learned after the weekend of the incident, whether those steps were reasonable steps. Not whether they were perfect, but whether they were reasonable. What should they have done that they didn't do beyond saying to the teachers, make sure you keep this woman away from this boy? And as best we can tell, they kept them apart, except for one incident 20 months later when he walked into a physical ed class and she was there. And even then they tried to keep him away from her and asked him to leave. What should they have done that they didn't do here? Well, it certainly goes to the issue of what were the known circumstances. And one of the circumstances was that the assistant principal never even asked Michael what happened. But even if you accept everything that was said, wasn't it reasonable under the circumstances not to speak with him when they had a pretty good idea of what had happened? Given the disability he had, they were concerned maybe about making the matters worse. Couldn't they have soundly said to themselves, well, we know what happened at the ball because we were told by the father, the mother. We had that report and we're going to question them and we're going to question the officer, Sergeant Cruz, and we're going to question the woman, Lorenz, herself. They just chose not to ask him anything. Why would that be so unreasonable under these circumstances to amount to deliberate indifference in the conduct of the investigation? Well, I would say two things in particular in response to that, Your Honor. The first is that Assistant Principal Nelson set his own barrier, his own boundary of what he wanted to do to find out what happened. And that included, as he put it, asking persons with the most intimate knowledge, which would necessarily, as he acknowledged, include Michael Saphir. Moreover, it was clear from what was told in the written report from the parents that they were not privy to everything that had happened. They discovered certain things and saw certain things that happened in a room with 400 people. So they did not have all of the information. So the argument is they were deliberately indifferent because their investigation wasn't thorough enough. That's your first point, right? That would be certainly part of it. What else should they have done that they didn't do? Well, the second thing is that based on the simple presentation of what was happened, Assistant Principal Nelson concluded that nothing inappropriate happened when, in fact, everybody else, including his superior principal, nearly acknowledged that on the face of what was described by the parents, that should have been reported to the Special Investigations Unit, which would have led to a suspension of that staff member from contact with students and Assistant Principal Nelson misled the parents into believing that their son, in fact, was going to be insulated. Assistant Principal Nelson told these parents she will be suspended. Well, they took some steps to insulate. They did. What other steps should they have taken? Because it seems to me the only step they could have taken that would have categorically made it impossible. We know she never talked to him afterwards. She never touched him. There was no interaction. The only thing is that they were on the same physical campus, and in the course of two years, maybe it wouldn't be surprising that they'd see each other. So it seems to me the only way to completely insulate the boy from her would have been to fire her. Was there anything short of firing her that they reasonably could have done here and should have done? I think even the school board's own policies, which would have called for suspending her pending a more thorough investigation. This goes back to the nature of the investigation, but if you get beyond that and one were to find that the investigation was pretty good, it wasn't great, they didn't bring in the FBI, they didn't question every conceivable witness, but they talked to six or seven of them, not eight of them. Once you get beyond that, what should they have done? Based on what they learned, could they reasonably say, the prophylactic rule is you stay away from that boy at all times and instructed the teachers to keep her away from him. Were they obliged to fire her, is my question, based upon what they knew? I wouldn't say they were obliged to fire her, but definitely remove her completely from... How could they remove her without firing her? They could have suspended her, reassigned her, because Michael was a disabled individual who was having significant emotional distress. He received an essential message from the school's response that what she did was okay, you misperceived, you misunderstood. That, to a 16-year-old who by the defense's own acknowledgement had several years of developmental delay based on his disabilities, is an extremely confusing picture. You said they should have removed her. I don't know what that means other than firing her. She was on the campus. He was no longer assigned to the classroom and the teacher at which he had previously been assigned, and he was assigned to a different class with a different teacher and a different class aide, right? He was not assigned to her class on a regular basis, but for the fact that it appears he was barred from speech and physical therapy not just once, but according to Albert Saphir, his father, it apparently had gone on for a lengthy period of time, not just one incident. That's what the record would report. So what could they have done short of firing her, I guess, is all I'm really asking. Assistant Principal Neely set out that process in his first conversation with Albert Saphir when he said she will be suspended and removed from contact with students, reassigned somewhere else. And, in fact, that's what the record reflects. They ultimately did when the police became involved two years later. They assigned her to a mail room to do clerical work away from students, and that was the procedure that they violated. And the principal himself said that is what should have happened in the first instance, but he didn't take any action to fix that. So that would be among the things they should have done. They also should have, frankly, given the totality of the circumstances, followed up with Michael to make sure that he was, in fact, not having contact with her that was causing distress. Again, this is a severely developmentally disabled young man who was very confused about what happened, and by virtue of what the parents described in their note, he was conflicted about what was going on. As Nubia Lorenz is resisting what the parents are saying, Michael is saying, well, she's my friend. That was his initial reaction, and his distress arose later. None of that was accounted for in the school's response. And what the case law says, this is, again, it's what is responsible under the totality of the circumstances, and at the core of those circumstances, in addition to what Nubia Lorenz did in public view, is the circumstances that Michael finds himself in as a disabled young man. That was not accounted for at all. He was marginalized and sidelined. This is a young man who should have at least been given the respect and the deference to be asked the question, what happened? What happened when your parents didn't see? How are you feeling about it now? That was not part of it. So the pivotal mistake, if I hear you right, was that the investigation wasn't thorough enough because they didn't question him. Absolutely. That was the pivotal mistake, because if they had, they would have presumably learned what the boy two years later told the psychologist. Yes, Judge. Thanks very much. You have reserved five minutes for rebuttal. Thank you, Judge. Good morning, Your Honors. Hudson Gill on behalf of the School Board of Broward County. With respect to the questions that were asked about what more could they have done, I think it's important to point out what the standard is for deliberate indifference. The 11th Circuit says it's an exacting standard. And it must be clearly unreasonable in light of the known circumstances, such that it's an official policy not to do anything. And I think if you look at the facts of this case and compare it to other cases, that's not what happened here. I guess what I heard from my colleague was that the fact they didn't interview Michael makes it deliberately indifferent. But what's unique about this case is while they maybe didn't interview him, they had eyewitness statements, essentially, from the parents. Because they were present at the ball, sitting next to Michael, when these incidents are alleged to have occurred. Well, I thought the fact pattern suggested that Michael and the woman were seated at another table. And the parents then sought to intervene to bring their son back to their table where he should have been. But they weren't at the other table for some prefatory period. Is that not right? That is correct, Your Honor. That they came together to the ball and then Michael walked in ahead of them with Miss Lorenz and sat at another table. They then went through the line, came in, and went over to them. How long did it take before they went over to the other table? Do we know from this record? I don't believe we know from this record, Your Honor. I mean, they indicate, I mean, their testimony was they went through the line, came in, and saw Michael and then tried to get him to come over to their assigned table. Your Honor, this, though, is not the case which typically comes up in these cases where something happens at school where the parents aren't present, the child comes home and tells the parents what happened. They then indicate to the school board what they've been told. And again, you have eyewitnesses from the parents providing testimony through their e-mail. I take it there's no evidence that the parents were ever told at the time by their son that he had been sexually touched by her. No, Your Honor. The parents didn't know that. No one knew that until Michael revealed it. Well, Michael knew that. Correct. But he didn't reveal that to anyone. Right. But if they had taken the step of speaking to Michael, they would have learned that right on the front end, wouldn't they? Presumably. That's not so idle and fanciful, is it? He told the shrink later. Presumably, he would have told the school earlier. I think that's, we're guessing what would have happened if Michael told them. He didn't tell his parents either. So I think to say that that would have happened is just, we don't know that, Your Honor. But even if it did, Your Honor, the response they had was to interview a number of people involved and then take steps that Your Honor pointed out to make sure there was no contact. But it would not have been reasonable, would it, if they knew on the front end what they learned on the back end to take the steps they did take? I think it would have been a different circumstance. But I'm asking, I know it would be different. And I'm asking whether that would have been, the steps they took would have been unreasonable. No, Your Honor, because it was ultimately totally effective in preventing any further acts of harassment. I mean, this is not a case where they're told something, they have an investigation, and something else happens. This is a situation where there's a single incident, alleged incident or single incident of sexual harassment, and then there are no further incidents of sexual harassment. As you point out, there's no contact, she never speaks to them again. The evidence is there's a couple times when they see each other on campus in a classroom, and then apparently when he's walking to an after-school program, he sees her on campus. So without that second incident, Your Honor, I don't believe there's any case that they've cited that holds where just simply one incident with no further acts leads to liability for a school board, especially under the type of allegations that were made here in the email and then even subsequently to the... Why was it reasonable for the principal in conducting his investigation not to speak with the boy? Well, Your Honor, I don't know if there's any record evidence of that, but I do think you pointed out... Only we know he didn't speak to the boy. Correct, Your Honor. And we know he spoke to six other people. Yes, Your Honor. I think if you look at an email that Michael Saphir's parents sent to the school board, which is part of the record, and it's at DE26-1 at page 51, and this is in November of 2013. In the second paragraph, Mr. Saphir talks about some of the issues Michael has with... You know, he doesn't say lying, but he says in relaying the truth, and I'll read from the paragraph. We understand that there are eight challenges, although we know not all of them are patterns of lies, but often due to his severe, and that's underlined, memory and language issues that frequently get him completely confused, flustered, or trying to make up what he thinks is accurate or expected, but is often wrong. Where would we find that? That's a... That's an email from... It's from the Saphir email address, but it's signed, I believe, by Albert, and it was attached to Mr. Saphir's deposition, and it's at docket entry 26-1 at 51. So this is what the father says about his son. Correct. But did he tell the principal that on the front end when he filed his complaint? There's no evidence of that, Your Honor, but this is something that was an ongoing problem if you read the testimony with Michael and some of the issues he has. So in terms of... When you have the parents sitting there providing eyewitness testimony, essentially in the form of their email, and then the conversation of what happened, it was certainly reasonable not to go with Michael Saphir, where the principal does take steps to correct the situation. He says no more contact, communicates it to the teachers, and it's effectively carried out. And I would also like to point out, my colleague mentioned something about him being denied speech class, and I think it's important to look at the record there of what the evidence actually shows. There was apparently an issue where during the eighth period, Michael wasn't getting education for a period of time, but there's no record evidence connecting that to anything to do with the ball incident or the complaint that's made afterwards. If you look at the actual record evidence, Albert Saphir... What class had he not been given the opportunity to go to? It's not clear. It has to do with the way the after-school program was organized and that he would have some down time when he got back from a program where he would leave the campus with other ESE students and essentially work. And then before his after-school program, there was still time at school, and for a period of time, he was going to guidance and wasn't actually getting education. And that was addressed at one point, and so he starts getting speech, and that's when the PE issue comes up. But there's no evidence that the reason he wasn't getting it had to do with Mrs. Lorenz or the incident at the ball. I mean, there's simply no evidence. It actually indicates it was something that was going on and was unfortunately a scheduling issue but was not anything to do with Mrs. Lorenz or what happened at the ball. And I would encourage the court to read, especially what the appellant cites, and then go back to the record and read it because often when you really dial it down, it's not quite as broad or far-reaching as they claim. So that addresses why it wasn't literally indifferent. One of the things the principal said, I thought, to the father was, I'll keep him apart, and the second, he said, we'll get your boy some counseling, right? I believe that's what the record evidence shows, that the parents had asked for counseling and the principal indicated that would be something that would be provided. Do we know from the record whether in fact the school ever provided counseling? There is some record evidence to support that. If you look at, there's another email, thankfully, that is part of the record. It indicates that it took some time to get the counseling, but the counseling was eventually provided to the student. By the school, as opposed to having retained one privately. Yes. That there was some additional counseling that was done. Where would I find that in the record? I believe, Your Honor, it is at docket entry 26-14, which is just also a useful document in the case because it is a timeline prepared by the spheres in May of 2014, which lays out kind of the key events of what was going on and in terms of, for example, the retaliation claim, it shows the huge gap in time that occurred between when the complaint was made and when some of the things they complained about came up. And I believe the counseling is discussed in there, Your Honor, to show that eventually he was provided some counseling. But with respect to that, I'm not sure that I'm aware of any case law that holds that failing to provide counseling to a student, even though the principal indicated he would, would amount to a basis for liability. The reason I raised it is if I got it right from their brief, I think one of the things they complained about is that the school never followed through on that. They do complain of that, Your Honor, but I believe the evidence does show that eventually he was provided it. But I don't think that is a basis under Title IX to provide liability. Again, as I went through, I mean, this was, the school board's response was totally effective in preventing subsequent acts of sexual harassment. There's no real contact between Michael and the woman. So while it would have been better to do more and get that counseling, I don't think it makes their response deliberately indifferent. With respect to the, I guess, the Cruz issue or the Sergeant Major Cruz issue, we think the court appropriately found that Sergeant Major Cruz was not an appropriate person under Title IX. The record evidence showed that he was merely a helper at the ball, but more importantly, he was not Lorenz's supervisor and he was merely a teacher at the school, which really means he's so low down in the totem pole that he's not an appropriate person under Title IX. He couldn't take any of the corrective measures that this court has indicated are important in these investigations. He couldn't discipline her. He couldn't reassign her. He couldn't change schedules or anything like that. So that makes Sergeant Major Cruz not an appropriate person under Title IX in terms of receiving a complaint regarding sexual harassment. Ms. Lorenz was, she was retained in the same position at the school and permitted to come into frequent contact with Michael after the incident at the dance when the school officials were put on notice that there was a problem there. And I guess the, I guess my concern is why couldn't a reasonable jury find in Michael's favor on the negligence claim, the negligence supervision and retention claim? Isn't that enough for Cypress to get to the jury that those other incidents would not have taken place had action have been taken after that first incident? She would not have been permitted to come into frequent contact with him after that? I would say two things in response to that. One, I don't agree that the record supports the statement that there was frequent contact. If you look at, again, the email that I pointed out regarding the timeline, it discusses what the contact were. And as best it can be said, there is some time in 2013, it looks like, Michael says that Ms. Lorenz walked into a classroom he was in, they locked eyes, she then walked out. There's also a Halloween party where it's not clear if he actually saw her, but they were maybe going to be together, and that was brought to the school's attention and it was changed so Michael could participate and she couldn't, the P incident that you discussed. And then with respect to seeing him on school, in that timeline, they say that Michael revealed in March of 2014, was the first time he revealed it, that when he was in his after-school program, which he wasn't in all the time, that he would see her when he was walking two times a week from one class who was after-school program. So he would see her because she was working to get kids on the buses. So that's, I'm not, wouldn't necessarily agree that the record supports frequent. But nonetheless, your honor, in terms of negligence, the negligent hiring, retention, and supervision claims in Florida are designed to hold a governmental entity responsible for an intentional act of one of its employees that occurs outside the scope of employment. And the way they do that is they say entity employer, you're on notice somehow that this employee is deficient and then something happens. But here there's no prior notice at the relevant periods of time to put the school board on notice that Ms. Lorenz was somehow deficient and then some subsequent act to hold them responsible for. I mean, the only one act happened April 2012 and the record is undisputed that there were no prior incidents with Michael before that or any other student regarding Ms. Lorenz to put the school board on notice. So that deals with the negligent retention, supervision, and hiring. The other negligence claim, again, it involves a notice component. There's just simply nothing to put the school board on notice that how it organized the ball, how it implemented its policy, was somehow deficient so that they needed to make changes to, I guess, how they organized the ball so as to establish an ability. Let me ask you this question, suggested by what Judge Wilson asked you. Do we know from the record how big the campus was? I mean, what it physically looked like? It was a high school. And they also, like many high schools in South Florida, that are overcrowded, there are these trailers that also have classes, et cetera. What do we know about the physical layout of this high school campus? This is what is in the record, at least. In terms of the size of the school, I believe it's 5,000 or 6,000 students. That's in the record in the motion for summary judgment. And they do have, the school board calls them portables, Your Honor. I don't think they use the word trailer, but they do have... We'd call them trailers, right? I think the school board calls them portables. I mean, it's a portable classroom. It's not easily moved in the back of a car, I guess would be my point. But there are portable classrooms. That's part of the record. But other than that, how it's geographically laid out, there isn't a lot of evidence in terms of acreage or size, other than the fact that the record says there are portable classrooms, there are, I guess, brick and mortar buildings, and it's 6,000... Other than removing her completely from the campus, would there be any way, given the nature of the school, for over a period of two or three years for him not to see her from a distance? I mean, I... Would they have done anything that would have made it impossible for them to so much as have locked eyes from a block away or a football field away? I mean, I... To say they would never have any contact, I don't think, other than reassigning her to another school, that would be possible. Right, other than removing her from the campus, it would be pretty hard to do that. Yeah, I can't see another way that that would be possible, Your Honor. Thank you very much. Thank you, Your Honor. I'd just like to thank you for the opportunity and ask that you affirm Judge Mitra's order. May I please, the Court? I'd like to address first the issue of this contact, if I may, between Michael and Nubia Lorenz after the night of the ball. Michael's testimony was that he saw her so frequently he thought she was stalking him or following him, and that caused him tremendous emotional distress and fear, and that anxiety got to a level that he actually, the record supports, became suicidal. Furthermore, these were not incidents that were occurring months apart. I mean, for example, there was an issue made as to when it was discovered by the parents that Michael was being excluded from this eighth period of class. Counsel just stated, and I don't think he meant to mislead, but he said it was an after school. It wasn't after school. It was the eighth period of the day that Michael was barred from the physical education class and speech therapy and left in the guidance office after his internship, and the reason for that, the parents discovered, was because Nubia Lorenz was involved. She was the aide in the speech class, Dr. Sugarman's speech class, and she was an aide in the P.E. program. That's when Michael was barred, and when the parents found out about it and sent an email, the email response that got back says, quote, the other party will no longer be there, close quote. Let me ask you a question. Just help me with the facts that you made reference to. Did they have physical education like three times a week or something like that or every day? The eighth period, as I appreciate it from the record, could be used for P.E. on certain days, speech therapy on others. The way I read the record, and I may have this wrong, so correct me if I do, was that there was one occasion during the course of the two-year period of time that he couldn't go into P.E. because she was there. I think the record... Is that wrong? I think it's incorrect because what the record reflects in that respect is that's when Albert Sapir, the father, found out what was going on and then confronted, but it wasn't a one-off. This had been going on for some time. This being specifically that he was barred from P.E. classes other than that instance because she was there and instead of throwing her out, they barred him? That's my appreciation of the record. Where would I find that? That would be in Albert Sapir's testimony. Sapir said, I know that he was barred from P.E. on more than one occasion because she was there? My recollection is his testimony is that this... Or is that, this is what my boy told me? I believe his testimony was more generic, that it was his impression this had been going on for some time. That was the extent of his impression, that it was going on for some time. And when he found out from when Michael complained, I'm changing, Michael was at an internship at a hospital in the mid-portion of the day and then when he got bused back to the school, it would be time for eighth period, Michael would have changed into his gym gear because they were training for Special Olympics. Instead, he found himself in the office, in the guidance office waiting for the day to end because he couldn't be there because Lorenz was there. And I think it's also important to understand in this context that Michael was seeing her regularly but also there was a reinforced message that she had done nothing wrong and it was reinforced in part by Dr. Sugarman and Dr. Finfer who were also ESC teachers, special education teachers, when they told him, number one, you're not telling the truth about what happened at that ball and number two, you shouldn't be talking about this around other kids. Those were the things he was told. And so this was an ongoing thing over the course of two years and it had the compounding effect of impacting Michael's mental health to the point that he became suicidal. So to say that the fact that the school did not take an action that left him exposed to further physical assault disregards the fact that it was a sexually harassing atmosphere as well that persisted from Michael. And again, it's a subjective standard based upon what were Michael's needs, what were those circumstances. And it really originates with Assistant Principal Nelson's conclusion that when he interviewed Nubia Lorenz, he found her to be credible even though he had absolutely no training by his own admission in terms of how to evaluate whether or not a predator is telling you the truth. At the same time, he testified that he had no basis to reject what the parents said and what the parents described, according to Nelson's own superior, Principal Neely, was in fact a violation of the school's sexual harassment policy, should have been reported to SIU and should have resulted in her removal from campus, which under those circumstances, the other part of the evidence we haven't talked about is that the Assistant State Attorney stated in her closeout memo when she did finally hear from the police over two years later that had I known at the time, had this been timely reported, I absolutely would have charged her with a crime and then Michael wouldn't be in this situation today. Thank you very much, Counsel. Thank you. We'll take the case under advisement and this court is adjourned.